STEAKS UNLIMITED, INC., Appellant,

v.

Donna DEANER and WTAE–TV4 and Hearst Corporation, Appellees.

No. 79–1716.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1979.

Decided April 24, 1980.

As Amended June 4, 1980.

Stuart K. Miller (argued), Robert N. Gluck, Gluck & Miller Law Offices, Wooster, Ohio, for appellant.

John P. McComb, Jr. (argued), Thomas E. Boyle, Moorhead & Knox, Pittsburgh, Pa., for appellees.

Before ADAMS, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a summary judgment in favor of the defendants in this diversity action presents a series of important questions dealing with the law of defamation. The initial substantive inquiry is whether, under Pennsylvania law, the plaintiff, a retail meat company, has sufficiently supported its allegations that it was defamed in order to survive a motion for summary judgment. Second, we must decide the more difficult constitutional question whether the plaintiff, for purposes of this litigation, is a public figure as a result of its intensive advertising and sales campaign. A correlative issue is whether the district court erred in concluding that the plaintiff could not prove that the defendants entertained subjective serious doubts about the truthfulness of their broadcast allegations regarding the plaintiff. Finally, we must review the district court's ruling under the Pennsylvania shield law denying the plaintiff's discovery request for certain filmed outtakes.[1] We affirm.

### I.

In August 1976, Steaks Unlimited, Inc., an Ohio-based corporation, held a four day sale of meat at several Zayre department

---

1. "Outtakes" are portions of film shot in preparation for a news broadcast, but not actually shown on the air. *See* note 60 *infra*.

stores in the area of Pittsburgh, Pennsylvania. The product was United States Department of Agriculture (USDA) inspected, ungraded, frozen, tenderized, boxed beef, approximately equivalent to USDA commercial grade.[2] To promote its sales, Steaks engaged in a widespread advertising campaign that included radio and newspaper advertisements, large signs erected at sales locations, and the distribution of handbills to persons walking near the Zayre store. The total cost of the campaign exceeded $16,000.00.

Donna Deaner, a reporter and consumer affairs editor for WTAE–TV in Pittsburgh, began investigating Steaks' advertising and sales operations. In an affidavit, Deaner stated that her interest was aroused when she read one of Steaks' advertisements in the August 19th edition of the *Pittsburgh Press*. She averred that she considered the advertisement contrary to normal sales practices because it did not disclose the USDA grade or the price per pound of the beef. Deaner also said that, from August 19 through August 23, she received telephone complaints from a number of Steaks' patrons regarding the quality of the beef and the company's sales practices. According to Deaner, the calls reinforced her initial suspicions that Steaks was engaging in deceptive sales tactics and persuaded her that further investigation was warranted.

On August 23, Deaner and her assistant, Ruth Lando, telephoned Ann Fox, administrator of the Allegheny County Bureau of Consumer Affairs, to determine whether the agency had investigated Steaks. Fox told them that she believed Steaks' advertisement in the *Pittsburgh Press* might be misleading, deceptive, and in violation of state laws. Citing a lack of resources, however, Fox stated that the agency was unable to conduct its own investigation and suggested that WTAE–TV look into the matter.

Later that day, Deaner and Lando visited Murphy's Meats, which is in the same shopping center in which Steaks was conducting its sale. In her affidavit, Deaner related that she asked Tom Ernette, an employee of Murphy's Meats from whom she had obtained reliable information in the past, if he was familiar with the sale. According to Deaner, Ernette replied that he had purchased a box of T-bone steaks from the sale and that, in his opinion, the beef was of "very poor quality," possibly the equivalent of utility, canner, or cutter—grades of meat inferior to commercial grade. Deaner and Lando then walked over to Steaks' sale. Lando entered the Zayre store where she observed Aubrey Mills, a Steaks' sales agent, talking to customers. In an affidavit, Lando stated that in her opinion Mills was misrepresenting both the price and the quality of the beef. According to Lando, Mills stated that the price per pound was about one dollar, although in fact it was closer to two dollars, and announced that the beef was equivalent to beef sold in Pittsburgh supermarkets, which in Lando's view was an incorrect statement. Lando left the store and returned with Deaner, who listened to Mills and also concluded that he was misleading the customers. The two reporters then summoned a film crew.

Upon the crew's arrival, Deaner conducted a filmed interview with Mills in which Mills made what Deaner and Lando again believed were inaccurate and misleading statements about the price and quality of the beef. Deaner also interviewed several other persons whose identities have not yet been disclosed.

After returning to the newsroom, Deaner telephoned Stanley Berkovitz, Zayre's director of consumer affairs. According to Deaner, Berkovitz told her that Steaks merely leased space from Zayre and that he knew little else about the company. Deaner proceeded to inform Berkovitz of what she knew about Steaks, and he said that he would talk to a few people and call her back. Shortly thereafter, Berkovitz telephoned to say that his company's contract

---

**2.** The Department of Agriculture has established eight grades for commercially sold beef. From highest to lowest quality they are: prime, choice, good, standard, commercial, utility, cutter, and canner. For a description of each grade, see 7 C.F.R. § 2853.106 (1979).

with Steaks called for the latter to sell commercial quality beef at prices lower than those set by local supermarkets. Berkovitz also stated that, as a result of Deaner's revelations, Zayre was going to terminate its association with Steaks.

Deaner then set about drafting and editing the script and film for broadcast on that night's 6:00 p. m. news program. In this endeavor, she was supervised by William Church, the station's assistant news director. Church recited in an affidavit that, after talking with Deaner, reading her script, viewing the film, and in light of Deaner's "outstanding reputation for truthfulness and accuracy," he concluded that the material chosen for broadcast was "truthful and accurate."

John Conomikes, the vice-president and general manager of WTAE–TV, stated in his affidavit that he had received a telephone call on the afternoon of August 23 regarding Deaner's investigation of Steaks from a person identifying himself as Darl Harkleroad, Steaks' president. According to Conomikes, he told Harkleroad that he would check the veracity of the story before it was broadcast. Conomikes then claimed that he called Church and Deaner who each convinced him that the broadcast would be truthful and accurate.

Late that same afternoon, according to Deaner, Harkleroad telephoned the newsroom. Deaner claims that she returned his call shortly before airtime and asked whether his company's product was in fact commercial grade beef. Deaner recalls Harkleroad responding that, although the beef was ungraded, it came from "mature, grassfed" cattle and was the equivalent of USDA grade beef. Steaks denies that this conversation took place.

Deaner's report was broadcast that night. Paul Long, the program's anchorman, introduced Deaner with the comment that she had "a warning . . . for those looking for bargains at a big steak sale." Deaner first recounted her initial suspicion about Steaks, commenting that the company's advertisements did not mention the USDA grade of the beef and that "the price per pound was mysteriously missing from the ad." The report then cut to a film clip of Deaner's interview with Mills in which he is quoted as saying that Steaks' T-bones were "lovely, fully dressed and trimmed," and a "fantastic bargain at $21.75 per pack." When asked the price per pound, however, Mills replied, "per pound the prices vary." Deaner then charged, "[t]he truth of the matter is they do everything possible to avoid telling you the price per pound, . . . because when you take the time to figure it out and compare prices, you'll find that the meat being sold here isn't that much cheaper than the meats being sold in local supermarkets or meat markets." Deaner also declared that Mills' description of the beef as "fantastic" was a "total misrepresentation." She asserted that Steaks actually was selling commercial grade beef, which she stated came from "old tough animals" and was tenderized "with a variety of chemicals to make it palatable." The report quoted Mills representing that local supermarkets carry some ungraded beef. Deaner commented that this was "[a]nother misrepresentation" and that "very reputable supermarkets or meat markets in this area sell either choice or good quality beef. They would not even touch commercial quality meats." In conclusion, Deaner reported that "[t]oday, Zayre's officials learned about the quality of the meat and the deceptive sales tactics, and decided to thoroughly end their endorsement of this big steak sale." [3]

Alleging that it was defamed by the broadcast, Steaks brought this action in the District Court for the Northern District of Ohio against Deaner, WTAE–TV, and the Hearst Corporation—WTAE–TV's parent company. Federal jurisdiction was premised on diversity of citizenship.[4] On

---

3. A full transcript of the broadcast is reprinted in an appendix to the opinion of the district court. *Steaks Unlimited, Inc. v. Deaner*, 468 F.Supp. 779, 786 (W.D.Pa.1979).

4. 28 U.S.C. § 1332(a) (1976). Steaks was both incorporated and maintains its principal place of business in Ohio. At the time the complaint was filed, Deaner was a citizen of Pennsylva-

the defendants' motion for a change of venue,[5] the case was transferred to the District Court for the Western District of Pennsylvania. In its complaint, Steaks asserted that the broadcast was "false, scandalous, malicious, defamatory and libelous," and that the defendants aired it with a conscious disregard for the truth and with the intent to impeach the company's "honesty, integrity, and reputation." Steaks also alleged that, as a result of the broadcast, Zayre and another department store chain stopped doing business with it, and that it lost a number of potential customers as well. Steaks asked for $1.5 million actual damages and $3 million exemplary damages.

During pretrial discovery, Steaks requested that the defendants produce the outtakes of the Deaner report.[6] The defendants refused on the ground that they were protected by the so-called Pennsylvania shield law.[7] Asserting that the outtakes were crucial to the central issue of the case—the defendants' state of mind in editing and broadcasting the report—Steaks moved to compel discovery.[8] The district court held that the outtakes were protected by the shield law and denied the request.[9]

As frequently occurs in libel cases, the defendants moved for summary judgment. Following oral argument, the district court granted the motion and entered final judgment in favor of all defendants. The court determined that the question of the truth of some of Deaner's allegations presented a genuine issue of fact.[10] It held, however, that Steaks was a public figure and concluded that the company could not meet its burden of proof—namely that the defendants acted with knowing or reckless disregard for the truth.[11]

On this appeal, Steaks argues that (1) the district court erred in holding that it is a public figure; (2) whether or not it is a public figure a genuine issue of fact exists; and (3) the court incorrectly construed the Pennsylvania shield statute as precluding it from discovering the content of the outtakes.

## II.

The threshold inquiry is which state's substantive law is applicable to this diversity action.[12] The parties have agreed that Pennsylvania law governs the substantive issues, and the district court applied Pennsylvania law. Inasmuch as Pennsylvania has an interest in the outcome of this litigation—the allegedly defamatory acts as well as the subject of the disputed broadcast occurred in Pennsylvania—there is no cause for this Court, sua sponte, to challenge the

nia. WTAE–TV is a Pennsylvania corporation and maintains its principal place of business there. Hearst is a Delaware corporation and has as its principal place of business New York. Steaks claims $4.5 million in damages.

5. 28 U.S.C. § 1404(a) (1976).

6. Fed.R.Civ.P. 34.
The district court described the outtakes as follows:
At oral argument, counsel for defendants represented that the outtakes consisted of (1) an interview at the Zayre store with one Aubrey Mills, who was a transient employee of plaintiff whose whereabouts are presently unknown; (2) interviews at the Zayre store with two persons whose identities have not been disclosed; and (3) a private interview with a person whose identity has been disclosed. A portion of the Aubrey Mills interview, but no part of the other interviews, was telecast.

Steaks Unlimited, Inc. v. Deaner, 80 F.R.D. 140, 141 (W.D.Pa.1978).

7. 28 Pa.Stat.Ann. § 330 (1958) (reworded current version at 42 Pa.Cons.Stat.Ann. § 5942 (Supp.1979)).

8. Fed.R.Civ.P. 37(a)(2).

9. Steaks Unlimited, Inc. v. Deaner, 80 F.R.D. 140 (W.D.Pa.1978).

10. See Fed.R.Civ.P. 52.

11. Steaks Unlimited, Inc. v. Deaner, 468 F.Supp. 779 (W.D.Pa.1979).

12. See Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964); Klaxon v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

parties' consensual choice of law.[13] Accordingly, we turn to the determination of how a Pennsylvania court would be expected to resolve the substantive questions presented by this appeal.

## III.

■ Adjudication of a defamation case under Pennsylvania law involves two principal inquiries: (1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.[14] Inasmuch as resolution of the state law issues could obviate the need for inquiry into the constitutional questions—if we held, for example, that nothing in the Deaner report constituted libel under Pennsylvania law—we turn first to the Commonwealth's definition of defamation.

In *Corabi v. Curtis Publishing Co.*,[15] the Pennsylvania Supreme Court reviewed the Commonwealth's statutory and common law system of tort recovery for defamation.

It stated that the cause of action consists of two basic elements: First, the communication must be defamatory in nature and understood as such by the recipient.[16] Second, the communication must be uttered maliciously—that is, intentionally or negligently and "without just cause or excuse."[17] As to these elements, the plaintiff bears the burden of proof.[18] Pennsylvania also recognizes the affirmative defenses of truth and privilege based on public policy.[19]

■ The Pennsylvania Supreme Court has defined defamation as a communication that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[20] In Pennsylvania, "it is the function of the court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning. . . . If the court . . . [so finds], it is for the jury to determine whether it was so understood by the recipient . . . ."[21]

**13.** *See Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 501–02 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). *Cf*: *Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930) (application of Texas statute imposing longer statute of limitations to contractual claim than terms of contract provided held to violate due process because Texas had no contact with or relationship to the making or performance of the contract).

**14.** *See Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 n. 19 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).

**15.** 441 Pa. 432, 273 A.2d 899 (1971).

**16.** *Id.* at 441–42, 273 A.2d at 904.

**17.** *Id.* at 451, 273 A.2d at 909. *See* 12 Pa.Stat. Ann. § 1583 (1953) (current version at 42 Pa. Cons.Stat.Ann. § 8344 (Supp.1979)).

In all civil actions for libel, no damages shall be recovered unless it is established to the satisfaction of the jury, under the direction of the court as in other cases, that the publication has been maliciously or negligently made, but where malice or negligence appears such damages may be awarded as the jury shall deem proper.

**18.** 12 Pa.Stat.Ann. § 1584a (1953) (current version at 42 Pa.Cons.Stat.Ann. § 8343(a) (Supp. 1979)):

Burden of plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

**19.** *Corabi*, 441 Pa. at 449–50, 452, 273 A.2d at 908–09. *See* 12 Pa.Stat.Ann. § 1584(b) (1953) (current version at 42 Pa.Cons.Stat.Ann. § 8343(b) (Supp.1979).

**20.** *Corabi*, 441 Pa. at 442, 273 A.2d at 904; *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962). This is the standard set forth in both the First and Second Restatement of Torts § 559 (1938 & 1977).

**21.** *Corabi*, 441 Pa. at 442, 273 A.2d at 904 (citations omitted).

Thus, our initial substantive inquiry is whether, as a matter of Pennsylvania law, the statements made by Deaner and broadcast over WTAE–TV are capable of a defamatory meaning such that there might exist a genuine issue of fact in this regard.

■ Deaner's charges—that Steaks deceived its customers in regard to both the price and quality of its beef and that Steaks' characterization of its product was a "total misrepresentation"—if believed by Steaks' customers and business associates, could diminish the company's reputation and discourage others from dealing with it. Consumers can be reasonably expected to react adversely to misrepresentative advertising, and retail stores, such as Zayre, presumably would choose not to associate with a dishonest sales operation. Indeed, Deaner stated in her report that, as a result of her investigation, Zayre had decided to terminate its relationship with Steaks. Under these circumstances, we conclude that the statements made in the broadcast are capable of a defamatory meaning under Pennsylvania law.[22] Inasmuch as Pennsylvania assigns to the jury the task of deciding whether the broadcast in fact was understood by the viewers to be defamatory, and because the district court did not, and perhaps could not, resolve this question on the defendants' motion for summary judgment, there exists a genuine issue of fact in this regard.

■ The malice component of Pennsylvania's cause of action for defamation is "implied or presumed to exist from the unprivileged publication of defamatory words actionable per se."[23] This presumption can be negated, however, by the defense that the published material furthered "some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation.' "[24] In determining whether public policy would be served by denying a libel plaintiff recovery, Pennsylvania courts have tended to look for guidance to the First Amendment decisions of the United States Supreme Court.[25] In this regard, the Pennsylvania cases do not distinguish precisely between the common law basis for recovery and the limitations placed on such tort claims by the First Amendment. "Thus, even though in analyzing this case we start with Pennsylvania tort law, no rigid line of demarcation may be maintained between state law rules and constitutional norms, for both are intermixed in the Pennsylvania precedents."[26] Accordingly, we turn to the

---

**22.** *Compare* the facts of the present case *with Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1279–82 (3d Cir. 1979) (in banc) (statement by doctor that professional athlete had polycythemia was not defamatory under Pennsylvania law); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 502–04 (3d Cir.) (program implying that public official, in purchasing land for private use, had conflict of interest not defamatory under Pennsylvania law), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Doman v. Rosner,* 246 Pa. Super. 616, 371 A.2d 1002 (1977) (final report of psychology project investigator stating that project contradicted basic understandings regarding mutual goals of participants, not defamatory under Pennsylvania law); *Redding v. Carlton,* 223 Pa.Super. 136, 296 A.2d 880 (1972) (statement that town supervisor had conflict of interest in decision to purchase building site for township headquarters not defamatory under Pennsylvania law).

**23.** *Corabi,* 441 Pa. at 451, 273 A.2d at 909 (emphasis in original).

**24.** *Id.* (quoting *Montgomery v. City of Philadelphia,* 392 Pa. 178, 181, 140 A.2d 100, 102 (1958)).

**25.** *See, e. g., id.* at 453–54, 273 A.2d at 910; *Curran v. Philadelphia Newspapers, Inc.,* 261 Pa.Super. 118, 395 A.2d 1342, 1345–51 (opinion in support of affirmance), 1353–59 (opinion in support of reversal).

**26.** *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 502 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). In this same vein, the Court of Appeals for the Sixth Circuit recently observed:

Few areas of the law are as analytically difficult as that of libel and slander where courts attempt to mesh modern, first amendment principles with common law precedents. For the sake of clarity, we will discuss first the state law issues, then the constitutional problems presented by this case; but as a legal and practical matter, the two approaches are bound together.

*Orr v. Argus-Press Co.,* 586 F.2d 1108, 1111–12 (6th Cir. 1978) (footnote omitted), *cert. denied,*

law of libel as it has evolved within the confines of the First Amendment.

## IV.

■■■ In a line of decisions dating back to *New York Times Co. v. Sullivan*,[27] the Supreme Court has imposed on the various state defamation schemes a system of First Amendment limitations. In cases dealing with plaintiffs who are "public officials" or "public figures," states may not authorize recovery unless the plaintiff proves, "with convincing clarity," that the defendants published false material, knowing of its falsity or with reckless disregard of the truth.[28] Where the plaintiff is a private figure, however, the First Amendment forbids states to impose liability without fault, but otherwise permits them to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." [29]

Pennsylvania's standard of liability for suits brought by "private figure" plaintiffs is presently unsettled. In *Matus v. Triangle Publications, Inc.*,[30] the Pennsylvania Supreme Court adopted a rule announced the previous year by a plurality of the United States Supreme Court in *Rosenbloom v. Metromedia, Inc.*[31] There, three justices were of the view that, where the allegedly defamatory publication involved matters of "public or general concern," the First Amendment requires the plaintiff—

whether famous or anonymous, public or private—to prove that the defendants broadcast false material with knowledge of its falsity or with reckless disregard of the truth.[32] Noting that five members of the *Rosenbloom* court substantially agreed with the "public or general concern" test, the Pennsylvania Supreme Court in *Matus* "adopt[ed] as binding . . . the holding of the plurality opinion in *Rosenbloom*." [33] Two years after *Matus* was decided, however, a majority of the United States Supreme Court retreated from the *Rosenbloom* plurality's approach. In *Gertz v. Robert Welch, Inc.*,[34] the Court adopted a test based on the public-private dichotomy discussed above.

■■ The Pennsylvania Supreme Court has not reconsidered, in light of *Gertz*, the wisdom of its decision to adopt the public concern test. It is unnecessary for us today to predict how that court would decide this matter, however, because we conclude that Steaks is a public figure.[35] Thus, regardless whether the Pennsylvania Supreme Court would find significant the fact that the broadcast here concerned matters of public or general concern, Steaks is required by well-settled constitutional principles to prove, with convincing clarity, that the defendants broadcast false statements, knowing of their falsity or with reckless disregard of the truth.[36]

In *Gertz*, the Court identified three classes of public figures:

440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

27. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

28. *Id.* at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29 (public official); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (public figure).

29. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974) (footnote omitted).

30. 445 Pa. 384, 286 A.2d 357, *cert. denied*, 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972).

31. 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

32. *Id.* at 52, 91 S.Ct. at 1824.

33. 445 Pa. at 395, 286 A.2d at 363.

34. 418 U.S. 323, 346, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

35. *See* pp. 274–275 *infra*.

Two federal district courts have addressed this question and have reached opposing conclusions. *Compare Lorentz v. Westinghouse Elec. Corp.*, 472 F.Supp. 946, 952 (W.D.Pa. 1979) (Pennsylvania would adhere to *Rosenbloom* ) *with Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406, 411–12 (E.D.Pa. 1978) (Pennsylvania would abandon *Rosenbloom* and adopt negligence standard for suits involving private plaintiffs.)

36. *See* text at note 27 *supra*.

Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.[37]

To determine whether a particular plaintiff is a public figure, the courts are guided by several considerations. First, public figures "usually enjoy significantly greater access to channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater."[38] The Supreme Court has recently observed that effective access is "regular and continu[ed] access to the media."[39]

The second, and more important, factor is what the Court has identified as "a compelling normative consideration underlying the distinction between public and private defamation plaintiffs."[40] Simply stated, public figures are "less deserving of [judicial] protection . . . because they have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'"[41] In other words, public figures effectively have assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention.[42]

Steaks is not a public figure in the general sense of the term. "Absent clear evidence of general fame or notoriety in the community, and a pervasive involvement in the affairs of society," a libel plaintiff should not be deemed a public figure for all purposes.[43] There is nothing in the record here to indicate that Steaks is famous or widely involved in public affairs. Thus, it is not a public figure in the general sense. There is uncontroverted evidence, however, that Steaks so thrust itself into the purview of the Pittsburgh area public that the company can be characterized as a public figure for purposes of the controversy giving rise to this litigation.

Immediately upon its entry into the Pittsburgh area, Steaks launched an intensive campaign "over local radio stations, through local newspapers, by large signs displayed at the sales locations and by handbills given to persons walking near Steaks Unlimited Sales locations at the various Zayre stores."[44] The advertising costs exceeded $16,000.00. Moreover, both WTAE–TV and the Bureau of Consumer

---

**37.** 418 U.S. at 345, 94 S.Ct. at 3009. The Court of Appeals for the District of Columbia Circuit recently characterized members of the last category as "limited-purpose public figure[s]." *Waldbaum v. Fairchild Publications*, (D.C.Cir. 1980).

**38.** *Id.* at 344, 94 S.Ct. at 3009 (footnote omitted). *See Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 163, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C. J., concurring in the result).

**39.** *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

**40.** *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009.

**41.** *Wolston v. Reader's Digest Ass'n*, 99 S.Ct. at 2706 (quoting *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009).

**42.** As one commentator has put it: "By voluntarily abandoning anonymity in favor of the public spotlight and its attendant heat, public figures have knowingly exposed themselves to a predictable risk of being burned." Eaton, *The American law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1420 (1975).

**43.** *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013.

**44.** *Steaks Unlimited, Inc. v. Deaner*, 468 F.Supp. at 781.

Affairs received "numerous telephone complaints from Pittsburgh area consumers, complaining about the poor quality of Steaks Unlimited's beef as well as [about] asserted misrepresentations as to the quality and type of beef being sold."[45] Under these circumstances, the district court properly concluded that Steaks voluntarily injected itself into a matter of public interest —indeed, it appears to have created a controversy—for the purpose of influencing the consuming public. In short, through its advertising blitz, Steaks invited public attention, comment, and criticism.[46]

Steaks also possesses regular and continuing access to the channels of communication. There is no suggestion that the company had any difficulty purchasing as much advertising as it desired. Nor is there an allegation that any newspaper or radio station refused to sell Steaks advertising space or airtime after Deaner's report was broadcast. Thus, if it had so desired, Steaks could have purchased additional advertising in order to respond to or seek to refute Deaner's charges. Under these circumstances, Steaks does not have as compelling a claim for judicial relief as it might, had it not possessed alternative means of challenging the defendants' allegations. Accordingly, we hold that the district court did not err in concluding that Steaks, by reason of its intensive advertising campaign and its continuing access to channels of communication, is a public figure with respect to the controversy surrounding the Deaner report.[47]

■ As a public figure Steaks, in order to prevail on its claim, must prove with convincing clarity that the defendants broadcast false statements, knowing of their falsity or with reckless disregard of the truth.[48] There are two elements to this standard: First, Steaks must prove that at least some of the material contained in the broadcast was false.[49] Second, it must

**45.** *Id.* Steaks did not dispute this contention.
 Thus, it cannot be claimed that the defendants themselves created the controversy on which Steaks' status as a public figure is premised. *Cf: Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979): "Clearly those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."

**46.** *Compare* the facts of this case *with Wolston v. Reader's Digest, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (plaintiff cited for contempt by federal grand jury 16 years prior to attack on same subject held private figure); *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (mental health researcher who had received federal funds held private figure in his suit against senator for statements criticizing the research); *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (wife of industrialist not made public figure as a result of her highly publicized divorce; she did not "freely choose to publicize issues as to the propriety of her married life"); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (attorney not made public figure by his representation in subsequent civil suit of defendant in highly publicized criminal trial).

**47.** *Cf. Dacey v. Florida Bar, Inc.,* 427 F.2d 1292 (5th Cir. 1970) (author held to be public figure as a result of publication and television and radio promotion of book). *But cf. Vegod Corp.*

*v. American Broadcasting Co., Inc.,* 25 Cal.3d 763, 603 P.2d 14, 160 Cal.Rptr. 97 (1979) (retail clothing corporation not a public by virtue of "going-out-of-business" sale and advertising), *petition for cert. filed sub nom. American Broadcasting Co., Inc. v. Western Inst. of Retailing, Inc.,* 48 U.S.L.W. 3773 (U.S. May 27, 1980) (No. 79–1612).

 Inasmuch as we hold that Steaks is a limited-purpose public figure, there is no occasion to decide whether Steaks might be a public figure in all contexts solely because it is a corporation. For an opinion holding that all corporations are subject to the *Rosenbloom* test, see *Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F.Supp. 947 (D.D.C.1976). *Cf: Reliance Ins. Co. v. Barron's,* 442 F.Supp. 1341 (S.D.N.Y.1977) (corporation as public figure because of size of its assets and interest surrounding its recent $50 million public stock offering).

**48.** *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008; *New York Times,* 376 U.S. at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29.

**49.** Pennsylvania's placement of the burden of proving the truth of the communication on the defendant, *Corabi v. Curtis Publishing Co.,* 441 Pa. at 449–50, 273 A.2d at 908–09, would appear to be contrary to the constitutional limitations on state libel law enunciated by the Supreme Court. *See, e. g., Gertz,* 418 U.S. at 347 n.10, 94 S.Ct., at 3010 (rejecting Justice White's view that it would be constitutional for a state

prove that the defendants broadcast such material with the requisite state of mind.

The district court concluded that, on the basis of their respective affidavits, the defendants had substantiated the truth of most of the broadcast while Steaks had offered only "a modicum of evidence to place the truth of the statements in issue." [50] Nevertheless, resolving all doubts in favor of Steaks, the court declared that there exists an issue of fact as to Deaner's charges that Steaks' sales tactics were misleading, that reputable Pittsburgh stores did not sell commercial grade beef, and that Zayre terminated its relationship with Steaks because of the latter's sales practices.[51] Inasmuch as the defendants have not challenged the trial court's decision in this regard, we turn to the question whether Steaks could meet its burden of proving that the defendants acted with knowing or reckless disregard of the truth.

In cases following *New York Times*, the Supreme Court refined the knowing or reckless disregard standard. In *St. Amant v. Thompson*,[52] the Court held that public figure libel plaintiffs must prove that "the defendant in fact entertained serious doubts as to the truth of his publication." [53] And in *Gertz*, the Court characterized the *St. Amant* standard as requiring that such plaintiffs prove that the publication was made with a "subjective awareness of probable falsity." [54] Moreover, the *Gertz* Court reiterated that plaintiffs who are public figures "may recover for injury to reputation only on clear and convincing proof." [55]

■ Applying these standards, the district court concluded that there was no genuine issue of fact on the question whether the defendants entertained subjective serious doubts about the truth of the broadcast.[56] After reviewing the affidavits sub-

to require libel defendants to prove the truth of an allegedly defamatory statement); *New York Times*, 376 U.S. at 271, 84 S.Ct. at 721 ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . and especially one that puts the burden of proving truth on the speaker."). Inasmuch as the district court concluded that there exists a genuine issue of fact regarding the truth of some of the broadcast material, 468 F.Supp. at 783, and because the defendants have not challenged the decision on this appeal, we have no occasion to review either the correctness of the district judge's decision or the constitutionality of Pennsylvania's placement of the burden of proof.

**50.** 468 F.Supp. at 783.

**51.** *Id.*

**52.** 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

**53.** *Id.* at 731, 88 S.Ct. at 1325.

**54.** 418 U.S. at 334 n.6, 94 S.Ct. at 3004 n.6.

**55.** *Id.* at 342, 94 S.Ct. at 3008.

**56.** In reaching this decision, the district court considered both the normal summary judgment standard set forth in Fed.R.Civ.P. 56 and a more stringent standard, favored by several courts, that amounts almost to a presumption in favor of summary judgment. *See, e. g., Bon*

*Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864–65 (5th Cir. 1970); *Wasserman v. Time, Inc.*, 424 F.2d 920, 922–23 (D.C.Cir.) (per curiam) (Wright, J., concurring), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); *Guitar v. Westinghouse Elec. Corp.*, 396 F.Supp. 1042, 1053 (S.D.N.Y.1975) ("summary judgment is the 'rule,' and not the exception, in defamation cases") (emphasis deleted).

*Cf: Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C.Cir.1966) ("In the First Amendment area, summary procedures are even more essential" than in other cases), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). *But see Hutchinson v. Proxmire*, 443 U.S. 111, 120, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 n.9 (1979):

Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and does not readily lend itself to summary disposition. See 10 Wright & Miller, Federal Practice and Procedure § 2730, at 590–592. *Cf. Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

Inasmuch as we hold that the district court did not err in granting summary judgment under Rule 56, there is no occasion to consider here

mitted by both sides in the summary judgment proceeding, we hold that the trial court did not err in this regard.

Accompanying their motion for summary judgment, the defendants proffered a broad range of support for their contention that no genuine issue of fact exists on the question whether they acted with knowing or reckless disregard of the truth.[57] In separate affidavits, Deaner and Lando recounted how they became alerted to possible improprieties on the part of Steaks and retraced the course of their investigation. Deaner stated that her suspicions were aroused by Steaks' advertisement in the *Pittsburgh Press* that failed to mention either the price per pound or the grade of the beef offered for sale. Deaner and Lando asserted that they received numerous telephone complaints from dissatisfied purchasers of Steaks' beef. Deaner spoke with Fox of the Allegheny County Bureau of Consumer Affairs who told Deaner that she too had received complaints about Steaks' sales methods and that she believed Steaks' advertisements were misleading. Deaner's account of this conversation was corroborated by Fox's own affidavit. Fox also told Deaner that, in her opinion, the commercial grade of beef sold by Steaks was not, as Steaks was claiming in its advertisements, "fantastic."

Deaner and Lando also stated in their affidavits that they confirmed Fox's characterization of Steaks' beef with Ernette of Murphy's Meats. Ernette told the reporters that he had purchased beef from the Steaks sale and, in his opinion, the beef was at best commercial grade. Deaner and Lando then observed Mills, a Steaks' salesman, telling consumers that the beef was "fantastic" and a "fantastic bargain." Lando noted that Mills misstated the price of the beef and evaded specific questions about price per pound. Both reporters also stated that Mills told them that he knew he was selling inferior quality meat and was

deceiving the public, but abjured responsibility because he was "just a salesman."

After conducting a filmed interview with Mills, Deaner and Lando returned to the station. Deaner stated that she called Berkovitz, the director of consumer affairs for Zayre, who told her that, as a result of learning of Steaks' sales tactics, Zayre planned to terminate its relationship with Steaks. Deaner also stated that she spoke with Harkleroad, Steaks' president, about the allegations she was preparing to make on the evening's broadcast. Deaner and Lando also explained that they spent a considerable portion of the afternoon discussing the planned report with each other and with their superiors. In separate affidavits, Conomikes, the general manager of WTAE–TV, and Church, the station's assistant news director, each confirmed that he discussed the veracity of the report with Deaner. Church also stated that he read Deaner's script and examined the filmed interviews. All defendants averred that they were convinced of the truthfulness of the report.

Taken as a whole, the affidavits provide sufficient factual support for the defense set forth in the pleadings—namely, that the defendants believed that all of the material contained in the broadcast was truthful and accurate. In contrast, Steaks submitted only one affidavit in which Harkleroad denied that Mills told Deaner the beef sold by Steaks was of low quality, and in which he averred that his company's beef was "a good, portion-controlled, quality product and priced below market prices of beef in the Pittsburgh area." The Harkleroad affidavit did not, however, set forth any facts from which a jury could infer that the defendants entertained serious subjective doubts about the veracity of the material contained in the broadcast. Thus, although Steaks called into question the truth of some of Deaner's charges, it failed to respond to the defendants' denial that they broadcast any statements knowing of their

whether summary judgment might be the rule rather than the exception in libel cases.

**57.** *See* part I *supra.*

falsity or with reckless disregard for the truth.[58] Accordingly, there exists no triable question of fact in this regard.

## V.

Steaks' final contention is that the district court erred in denying its motion to compel the defendants to produce during discovery portions of the filmed interviews conducted at Steaks' sales location but not broadcast as part of the Deaner report.[59] The district judge denied the motion on the ground that the so-called outtakes [60] were protected by the Pennsylvania shield law.[61] On appeal, Steaks urges that the district court erroneously interpreted the statute and that the outtakes would reveal that the defendants omitted from the broadcast material favorable to Steaks. The company claims that this information would be relevant to the question whether the defendants acted with knowing or reckless disregard of the truth.

Defendants do not contend that the material contained in the outtakes would be irrelevant to Steaks' claim.[62] Rather, they urge that, as a matter of public policy, Pennsylvania has chosen to deny litigants access to materials that might reveal a source of the information.

The Commonwealth's shield statute provides:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such persons, in any legal proceeding, trial or investigation before any government unit.[63]

Pennsylvania courts have broadly interpreted this provision. The seminal case is *In re Taylor*.[64] *Taylor* arose out of a state grand jury's investigation of alleged political corruption in Philadelphia city government. The grand jury served a subpoena duces tecum on Robert Taylor, the president and general manager of the *Philadelphia Bulletin*, and Earl Selby, the paper's city editor. The subpoena directed Taylor and Selby to appear before the grand jury and to bring with them documents and tape

---

**58.** Fed.R.Civ.P. 56(e) provides in relevant part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

**59.** Fed.R.Civ.P. 37(a)(2).

**60.** The term "outtakes" is used here to refer to *nonconfidential* material, filmed or recorded in preparation for the Deaner report, but not included in the broadcast. For a description of the material contained in the outtakes sought by Steaks, see note 6 *supra*.

**61.** *Steaks Unlimited, Inc. v. Deaner*, 80 F.R.D. 140 (W.D.Pa.1978).

**62.** Indeed, comparison of the material actually published and other material, possibly favorable to the plaintiff, that was in the defendants' possession but omitted from the publication or broadcast is probably the most common method of proving that the defendants acted with knowing or reckless disregard of the truth. The jury is asked to infer from such a comparison that the defendants acted with subjective

doubts about the truthfulness of their publication. *See, e. g., Herbert v. Lando*, 568 F.2d 974, 984 (2d Cir. 1977) ("The jury is free to infer from Lando's use and application of the extensive materials discovered and equally important, from the failure to heed certain contradictory information."), *rev'd*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1978) (on ground that libel plaintiffs are entitled as well to discovery of materials directly evincing defendants' subjective mental state); *Washington Post Co. v. Keogh*, 365 F.2d 965, 967–68 (D.C. Cir.1966) (recklessness is "ordinarily inferred from objective facts").

**63.** 42 Pa.Cons.Stat.Ann. § 5942(a) (Supp.1979). This is a recodification of the shield law in effect at the time the district court rendered its decision. 28 Pa.Stat.Ann. § 330 (1953). The official source note accompanying § 5942 states that the new statute is "substantially a reenactment" of § 330. Although § 330, originally enacted in 1937, applied only to the written press, the Pennsylvania Supreme Court has interpreted the statute as also protecting radio and television stations. *In re Taylor*, 412 Pa. 32, 41 n., 193 A.2d 181, 185 n.4 (1963).

We are required by Fed.R.Evid. 501 to apply the Pennsylvania shield law.

**64.** 412 Pa. 32, 193 A.2d 181 (1963).

recordings compiled during the course of the paper's investigation of John J. Fitzpatrick, a former ward leader and Sergeant-at-Arms of the City Council. The *Bulletin* had published an article about Fitzpatrick titled "Fitzpatrick's Secret Talk to DA is Bared." Taylor and Selby appeared before the grand jury, but refused to turn over a number of the requested documents and to answer certain questions regarding conversations between Fitzpatrick and *Bulletin* reporters. The journalists contended that the Pennsylvania shield law gave them a privilege not to disclose the source of any information procured during the course of their paper's preparation of the story. Taylor and Selby were held in contempt of court and appealed.

The Pennsylvania Supreme Court reversed the contempt citations. The shield statute, in the court's view, represented "a wise and salutary declaration of public policy" that must "be liberally and broadly construed in order to carry out the clear objective and intent of the Legislature which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare than the disclosure of the alleged crime or the alleged criminal." [65] The term "source of information," according to the court, "means not only the identity of the person, but likewise includes documents, inanimate objects and all sources of information." [66] The court concluded that all of the notes and recordings of Fitzpatrick's conversations with *Bulletin* reporters were protected by the shield law, except those portions that had been published or otherwise publicly disclosed. Although Fitzpatrick obviously was the principal source of the information contained in the documents and recordings,

the court held that the nonpublished information given by Fitzpatrick was privileged because "the identity of many other persons may have been revealed in the questions and/or answers." [67] The court did not limit its holding to documents or recordings that might reveal the identity of a confidential source, nor did it attempt to separate the confidential and nonconfidential subpoenaed materials. Rather, the court concluded that the shield law protects all sources of information—persons, documents, and recordings—with the exception of information for which the privilege was waived by actual publication or public disclosure. [68]

The only other Pennsylvania case interpreting the shield law, *Hepps v. Philadelphia Newspapers, Inc.* [69] is equally as broad as *Taylor.* In *Hepps*, a libel action, the court of common pleas denied the plaintiff's motion to compel discovery of "(1) [n]otes of interviews with disclosed informants which do not reveal and cannot lead to the revelation of the identity of confidential informants, and (2) notes of interviews with both disclosed and confidential informants which either reveal, or might lead to the revelation of, the identity of confidential informants." [70] The court interpreted *Taylor* as holding that, "regardless of the reason, a reporter need not disclose those portions of an informant's statement [not actually published], whether or not the identity of the informant is disclosed." [71]

 Steaks sought outtakes consisting of three filmed interviews. One is the portion of Deaner's discussion with Mills that was not included in the broadcast. The other two are interviews with two of Steaks' customers whose identities have not been disclosed. Inasmuch as discovery of the latter would reveal the identity of the primary sources of information—the inter-

65. *Id.* at 42, 193 A.2d at 185–86 (footnote and emphasis deleted).

66. *Id.* at 40, 193 A.2d at 185 (emphasis deleted).

67. *Id.* at 43, 193 A.2d at 186.

68. *Id.* at 44, 193 A.2d at 186.

69. 3 D&C 3d 693 (1977).

70. *Id.* at 698.

71. *Id.* at 705. *See Mazella v. Philadelphia Newspapers, Inc.,* 48 U.S.L.W. 2343 (E.D.N.Y. filed Nov. 2, 1979) (interpreting the Pennsylvania shield law); *Altemose Construction Co. v. Building and Construction Trades Council of Philadelphia,* 443 F.Supp. 489 (E.D.Pa.1977).

viewees—there is no question that the Pennsylvania shield law, as construed in *Taylor* and *Hepps*, provides the defendants with a privilege to refuse to surrender them. The Commonwealth's policy of protecting against the forced disclosure of sources of information is clear and unequivocal in this regard.[72]

The outtakes of the Mills interview pose a slightly different problem. The primary source, Mills, is known. Thus, discovery of the outtakes would not necessarily reveal the identity of a source of information. Nevertheless, the outtakes are privileged under the *Taylor* construction of the shield statute. In *Taylor*, the court interpreted the statute as protecting not only the primary source of the information, but also possible secondary sources that might be disclosed by the primary source. The court did not require the journalists to demonstrate the existence of such secondary sources. Rather, it held that the statute protected all statements by the primary

source except those that were published or publicly disclosed, because "the identity of many other persons *may* have been revealed in the questions and/or the answers."[73] Similarly, even though the primary source of the Mills interview is known, discovery of the outtakes may reveal the identity of secondary sources. Inasmuch as *Taylor* protects all nonpublished portions of a source's statement, we hold that the outtakes of the Mills interview are protected even though the identity of the primary source of information is known. Accordingly, the district court did not err in denying Steaks' motion to obtain the outtakes.[74]

## VI.

Pennsylvania's decision to protect previously unpublished "sources of information" from compulsory disclosure is an important matter of state policy that we are bound to observe in the course of adjudicating questions of state law. Even more fundamental to our decision today, however, is the ques-

---

**72.** *In re Taylor*, 412 Pa. at 40, 193 A.2d at 184.

**73.** *Id.* at 43, 193 A.2d at 186 (emphasis added).

**74.** Inasmuch as we hold that the law of Pennsylvania affords the defendants a privilege not to comply with Steaks' discovery request for the outtakes, there is no occasion to decide whether there is a First Amendment privilege that protects outtakes from civil discovery. *See, e. g., Altemose Construction Co. v. Building and Construction Trades Council of Philadelphia*, 443 F.Supp. 489 (E.D.Pa.1977); *Loadholtz v. Fields*, 389 F.Supp. 1299 (M.D.Fla. 1975); *Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.1975). *Cf: Carey v. Hume*, 492 F.2d 631 (D.C.Cir.) (First Amendment provides qualified privilege against civil discovery by libel plaintiff of identity of *confidential* source), *cert. dismissed* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972) (same), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Garland v. Torre*, 259 F.2d 545 (2d Cir.) (same), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

For much the same reason, Steaks' reliance on *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), is misplaced. In *Herbert*, the Supreme Court held that the First Amendment did not *require* the federal and state courts to adopt an absolute discovery privilege for material implicating the "editorial process"—that is, for material that directly reveals the defendants' subjective state of mind.

*Id.* at 157 n.2, 99 S.Ct. at 1639 n.2. The Court reasoned that preclusion of an inquiry into the most direct source of evidence on the central question in a libel case involving a public figure plaintiff—whether the defendants entertained serious, subjective doubts about the truth of their publication—would substantially enhance the plaintiff's burden of proof in a manner inconsistent with *New York Times* and *Butts*. *Id.* at 158–69, 99 S.Ct. at 1639–45.

The Court did not hold, however, that it is unconstitutional for the states to establish a privilege against state-of-mind discovery. The Constitution has never been construed as requiring the states to provide persons or organizations who have been defamed with a remedy for their injuries. It follows that, to the extent a state chooses to authorize a cause of action for defamation, it may also limit the plaintiff's ability to prove his claim in order to promote other social purposes. Therefore, Pennsylvania's shield statute, adopted for the purpose of fostering freedom of the press, *see Taylor*, 412 Pa. at 42, 193 A.2d at 185, is not inconsistent with the Supreme Court's First Amendment analysis in *Herbert*. *Cf: In re Farber*, 78 N.J. 259, 394 A.2d 330 (*criminal defendant's* state and federal constitutional right to compulsory process of witnesses overrides state statutory privilege against compelled disclosure of confidential source), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).

tion whether Steaks, by launching an intensive advertising campaign for the purpose of attracting customers to its beef sale, transformed itself into a public figure for purposes of libel litigation. We have concluded that Steaks' actions were calculated to draw public attention to the company and to stimulate consumer interest in its product. The company thereby voluntarily relinquished whatever protection it may have possessed as a purely private entity and is, in the context of this suit, properly characterized as a public figure within the meaning of *Gertz*. As a public figure, Steaks must prove that the defendants, although entertaining serious doubts about the truth of Deaner's report, nevertheless chose to broadcast it. This standard, now firmly established by *New York Times* and its progeny, is considered an essential component of our system of free expression and debate, a central purpose of which is to foster and maintain an informed and active citizenry.[75]

These concerns are particularly important in this case. In recent years, there has been an increase in consumer interest and awareness. Consumer reporting enables citizens to make better informed purchasing decisions. Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster the First Amendment goals mentioned above. As

the Supreme Court recognized in *New York Times*, "would-be critics . . . may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense having to do so."[76] To the extent this occurs, consumers would be less informed, less able to make effective use of their purchasing power, and generally less satisfied in their choice of goods.

Application of the public figure rule to sellers such as Steaks, which through advertising solicit the public's attention and seek to influence consumer choice, therefore serves the values underlying the First Amendment by insulating consumer reporters and advocates from liability unless they have abused their positions by knowingly or recklessly publishing false information. Inasmuch as we hold that Steaks is a public figure, at least for the purposes of this litigation, and because the district judge did not err in concluding that no genuine issue of fact exists whether the defendants doubted the truth of their allegations and in denying Steaks' request for the outtakes, the judgment of the district court will be affirmed.

**75.** *See generally New York Times Co. v. Sullivan,* 376 U.S. at 269–83, 84 S.Ct. at 720–27; *Whitney v. California,* 274 U.S. 357, 375–77, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); J. Ely, Democracy and Distrust 105–16 (1979).

**76.** *New York Times Co. v. Sullivan,* 376 U.S. at 279, 84 S.Ct. at 725.

The cost of litigating a libel action, burdensome on even the largest news organizations, often can cripple smaller news operations. Five years ago, the minimum cost of defending a "full-fledged libel suit" was estimated at $20,000.00. Anderson, *Libel and Press-Self-Censorship,* 53 Texas L.Rev. 422, 435–36 (1975). The successful defense of *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) was nearly $100,000.00. *Id.* In *Sprouse v. Clay Communication, Inc.,* 211

S.E.2d 674, 690–91 (W.Va.), *cert. denied,* 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975), the West Virginia Supreme Court of Appeals expressed concern that in its state, "where a large portion of the State is served by newspapers which lack substantial financial assets, the threat of potential libel actions becomes repressive, not only because of possible judgments but also because of the inordinate legal expenses normally incurred in defending a protracted libel suit." *See also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 610 n.40, 96 S.Ct. 2791, 2827, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring in the judgment); Oakes, *Proof of Actual Malice in Defamation Actions: An Unsolved Dilemma,* 7 Hofstra L.Rev. 655, 713 (1979); Note, *In Defense of Truth in Defamation Law,* 88 Yale L.J. 1735, 1742–43 & n.39 (1979).