**QUANTUM ELECTRONICS CORPORATION,**
Plaintiff,

v.

**CONSUMERS UNION OF UNITED STATES, INC., Defendant.**

Civ. A. No. 93–208L.

United States District Court,
D. Rhode Island.

April 13, 1995.

Kevin M. Brill, Corrente, Brill & Kusinitz, Providence, RI, for plaintiff.

Michael N. Pollet, Pollet & Pollet, New York City, Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI, for defendant.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the Motion for Summary Judgment filed by defendant, Consumers Union of United States, Inc. ("Consumers Union"). Pursuant to Fed. R.Civ.P. 56(c), Consumers Union seeks summary judgment in its favor on each of the four counts contained in the Complaint filed in this action by plaintiff, Quantum Electronics Corporation ("Quantum"). Quantum's claims arise from an October 1992 magazine article in which Consumers Union criticized the safety and effectiveness of an ozone generating air purification device manufactured by Quantum. Counts I, II and III of the Complaint set forth claims for defamation, while Count IV avers a claim for product disparagement.

### I. *FACTS*

The Court begins with an overview of the extensive factual record produced by both parties for the purpose of this motion. The following facts are undisputed, except where noted. Consumers Union is a New York not-for-profit corporation that publishes a monthly national magazine, *Consumer Reports,* in which various consumer products are tested and reviewed. Quantum is a Rhode Island corporation that manufactures and sells ozone generating air purifiers. In the Octo-

ber 1992 issue of *Consumer Reports*, Consumers Union published an article entitled "Household Air Cleaners" (the "article"). The article included comparative reviews of several types of air cleaners including filtration systems, electrostatic devices, and ozone generators. Two ozone generators were reviewed: the Alpine 150, manufactured by Alpine Air Products ("Alpine"), a Minnesota company, and the Panda Plus Q11 (the "Panda Plus") which is manufactured and sold by Quantum.[1]

Quantum filed this lawsuit alleging that the article published by Consumers Union contained several falsehoods which were defamatory and disparaged Quantum's product. Specifically, Quantum complains that Consumers Union concluded in the article that the Panda Plus is "not acceptable" because it emits ozone at a level which exceeds Federal government standards promulgated by both the Occupational Safety and Health Administration ("OSHA") and the Food and Drug Administration (the "FDA"). Pertinent portions of the article follow:

> Ozone can purify drinking water, disinfect mildewed boats, and deodorize fire-ravaged buildings. But ozone is also a toxic gas, a component of smog, with no known beneficial health effects.

> The U.S. Occupational Safety and Health Administration limits ozone exposure in industrial settings to 100 parts per billion (ppb) over an eight-hour day, six days per week. At that level, ozone irritates the eyes, makes the throat feel dry, and stresses the lungs. The U.S. Food and Drug Administration has set a limit of 50 ppb for the ozone from electronic air cleaners. That's a sensible limit for the home, in our judgment.

> Given those facts, an ozone-generating air cleaner would seem a contradiction in terms. But the makers of the *Alpine 150*

and the *Quantum Panda Plus Q11* would like you to believe otherwise.

The article noted that a Minnesota court found Alpine guilty of consumer fraud for claiming that ozone provides health benefits and representing to consumers that Alpine's ozonators emit only harmlessly low levels of ozone. The article then stated:

> The *Quantum's* maker is more circumspect, saying, for example, that its ozone generator "running at full capacity continuously in a room measuring 10 by 15 feet, will produce an ozone concentration that is half the OSHA limit."

> . . . .

> When we tested the *Alpine* and *Quantum* under a variety of conditions, they almost always produced ozone levels well above the FDA's limit of 50 ppb.

> In a sealed test chamber, the *Quantum* generated 150 ppb of ozone on its Low setting, 2700 ppb on High after 15 hours of operation. . . .

> We also ran each unit at its high ozone setting for at least 24 hours in a chamber set for one complete air change an hour. The *Quantum* produced 700 ppb. . . .

> We judge both the *Alpine 150* and the *Quantum Panda Plus* Not Acceptable.

> . . . .

> Ozone generators have limited value in unoccupied spaces. But we don't think they belong where people breathe.

Finally, the article concluded, "We wouldn't recommend an ozone generator even as a last resort. The two in the Ratings, the *Alpine 150* and the *Quantum*, weren't very effective. They can also produce unhealthy levels of ozone." [2]

The Panda Plus is an ozone generating air cleaning device manufactured and sold by Quantum. The Panda Plus is designed to

---

1. Quantum is not affiliated with Alpine.

2. Quantum alleges that Consumers Union concluded the Panda Plus was ineffective based on odor removal tests performed only on the Alpine ozonator. Consumers Union admits that it only tested the Alpine for odor removal, and the article itself states, "The Honeywell F59A, the Austin Air Sierra, and the Alpine 150 claim to be able to remove [tobacco smoke] odors, so we tested

them in a chamber reeking of tobacco." Consumers Union argues that because the Alpine and Quantum ozonators function on identical principles, the results achieved on the Alpine can be generalized as indicative of the effectiveness of both ozonators at removing smoke odors. Quantum has produced no facts to dispute this conclusion.

clean the air by generating ozone, a gas composed of three oxygen atoms which serves to break down the molecular structure of other airborne gases through the process of oxidation. At least three federal agencies have established safety standards that set out maximum acceptable levels of ozone. First, OSHA limits exposure to ozone in industrial settings to 100 ppb. 29 C.F.R. § 1910.1000 (1994). Second, the Environmental Protection Agency ("EPA") has set 120 ppb as the limit for ozone in outdoor air. 40 C.F.R. § 50.9 (1994). Third, the FDA has established 50 ppb as the maximum level of ozone acceptable in indoor spaces occupied by people. 21 C.F.R. § 801.415 (1994). These regulations reflect a widely-held belief in the scientific and medical communities that exposure to excessive concentrations of ozone poses health risks to humans, particularly to the respiratory system. Consumers Union has cited, and Quantum has not refuted, a multitude of authorities, including the pertinent government regulations and numerous articles from scientific and medical literature, to illustrate the health concerns regarding ozone.

Consumers Union's household air cleaner project, which culminated in the October 1992 article, began in September 1991 when Frank Iacopelli ("Iacopelli") was assigned to lead the project team evaluating home air cleaning devices. Iacopelli, a trained chemical engineer, spent eight months working full time on the air cleaner project. The first stage of his work involved extensive research about air purifiers. During his research, Iacopelli consulted government regulations and publications, articles from scientific and med-

ical journals, and materials generated by Consumers Union during prior projects involving air purifiers.

While researching ozonators, Iacopelli noted the regulations promulgated by OSHA, the EPA, and the FDA. Based on his research, Consumers Union decided to adopt the FDA limit of 50 ppb as the benchmark for its testing. This regulation was promulgated by the FDA in 1976 and applies to room air purifiers that generate ozone either incidentally or intentionally. The FDA characterizes ozone as "a toxic gas with no known useful medical application" and notes that to be effective as a germicide, ozone "must be present in a concentration far greater than that which can be safely tolerated by man and animals." 21 C.F.R. § 801.415 (1994). Along with the FDA, many health scientists agree that there are health risks associated with exposure to ozone at concentrations greater than 50 ppb.[3]

Having settled on the 50 ppb benchmark, Iacopelli next considered what test methodology to use to measure the ozone output of the ozonators. He consulted Mark Connelly ("Connelly"), a Director of Testing at Consumers Union, and decided to adapt tests developed by Underwriters Laboratories ("UL") as part of UL Standard 867.[4] Quantum does not dispute that Consumers Union followed the methodology set out in UL Standard 867. Rather, Quantum alleges that this methodology was inappropriate, and through the affidavit of Asciano G. DiPippo, Ph.D. ("DiPippo"), suggests that there are several other "generally accepted, more accurate, well-tested procedures" available.[5]

---

**3.** In 1990, the American Lung Association of Minnesota recommended against the use of ozonators "because of the possibility of reaching elevated levels [of ozone] in enclosed spaces."

**4.** UL Standard 867 relates to the testing of electrostatic air cleaners. Part of that standard relates to the ozone output of such devices. Like the FDA, UL adopts 50 ppb as the maximum allowable ozone concentration produced by a product for household use. Standard 867 calls for ozone testing in a sealed room 8 by 12 by 10 feet in size, and for placement of the ozone monitor sampling tube 2 inches from the outlet of the product and pointed directly into the air stream. Ozone emissions are to be monitored

over a 24 hour period to determine the concentration of ozone.

**5.** Attached to DiPippo's affidavit are copies of ozone testing procedures developed by the National Institute for Occupational Safety and Health ("NIOSH") and the American Chemical Society. DiPippo also testifies, in conclusory fashion, as to the existence of a test developed by the American Society for Testing and Materials. Consumers Union does not dispute that other methods for testing ozone exist. Quantum does not dispute that Consumers Union in fact adopted the test procedure set out in UL Standard 867. It is an undisputed fact, therefore, that although several test methodologies exist,

Initially, Consumers Union intended to test only the Alpine 150, an ozone generator manufactured by Alpine. However, during a discussion with Roger Stube ("Stube"), a Senior Project Leader in Consumers Union's Chemistry and Textile Department, Iacopelli first became aware of Quantum's ozonators. After reading about Quantum in *Practical Sailor* magazine, Stube had contacted James Lathan ("Lathan"), then-president of Quantum, to inquire about purchasing a Quantum ozonator for use in a Consumers Union laboratory. Lathan wrote to Stube on July 19, 1991, and suggested that the Panda Plus model ozone generator would solve an odor problem in the textile laboratory. The letter, addressed to Stube at Consumers Union, stated:

> The 90's, being the decade of the environment, will promote a myriad of garage operations producing ozone generators and other types of air purification devices. Should your Company elect to do a comparison study on such devices, may we respectfully ask that our products be included in such a study? If you would be so kind as to forward this request, along with the enclosed information, to the proper department, I would be greatly appreciative.

Included with the letter was a copy of a paper written by Michael Ferrante, Quantum's Director of Research and Development, entitled "Quantum Ozone Generator—Type 'A'" which discusses, in some scientific detail, the benefits of ozone generators and concludes by complaining that ozone gets a "bad rap." Also included was a reprint of an article about Quantum's ozone generators that was published in *Practical Sailor* magazine's December 1990 issue. This article includes a claim by Lathan that the Panda ozonator "is the first one that doesn't produce potentially irritating by-products" and

states that "Quantum machines running at full capacity continuously in a room measuring 10 by 15 feet will produce an ozone concentration that is half the OSHA limit." The *Practical Sailor* article also attributes to Lathan the statement, "[I]f an individual sequestered himself in a 10 by 10 room with the machine running for 24 hours a day for a week, there probably would be some noticeable irritation of nasal membranes." Following his conversation with Stube, Iacopelli decided to include a Quantum ozonator in Consumers Union's air cleaner reviews.

Consumers Union then purchased a Quantum ozone generator. It was decided that the Editorial Department would purchase the ozonator anonymously.[6] Jeffrey Fox ("Fox"), the Assistant Editor responsible for writing the article, was assigned to purchase a Quantum Panda Plus ozone generator. There is a factual dispute as to the reasons why Consumers Union decided to purchase the Panda Plus model.

Quantum alleges, through the affidavit of its sales representative, James H. Maher ("Maher"), that on December 23, 1991, Fox came to Maher's home to discuss purchasing a Quantum ozonator. Maher alleges that Fox wanted a unit suitable for use in a one or two room house or condominium of approximately 1200 square feet, and that Fox specifically requested the Panda Plus. Maher asserts that he told Fox the Panda Plus was too large for that application, and that the smaller Panda model was more appropriate. However, Maher states that Fox was adamant about purchasing the Panda Plus and was not interested in the Panda. Accordingly, Quantum concludes that Consumers Union intentionally inflated the ozone concentrations it discovered through its testing by insisting on purchasing the larger Panda Plus.

---

Consumers Union chose to use UL Standard 867. Interestingly, Consumers Union alleges that its decision was motivated, at least in part, by the assertion made in Quantum's own product literature that its products comply with UL Standard 867. Quantum does not dispute that its literature makes this claim.

**6.** Consumers Union admits this was a deviation from its usual practice. Normally, products to

be tested are purchased by shoppers. In this case, the Editorial Department itself purchased the ozonator because Alpine, Quantum's competitor, reportedly used sales tactics that made exaggerated health and safety claims about ozone. Consumers Union alleges that it wanted to determine whether Quantum's sales representatives made similar claims. Consumers Union determined that they did not.

Conversely, Consumers Union alleges that Maher never told Fox either that the Panda Plus was too large or that he should purchase the Panda instead. Consumers Union explains that it chose the Panda Plus because its ozone output more closely matched that of the Alpine 150, the unit to which it would be compared in the article. Additionally, Consumers Union points out that Quantum marketed the Panda Plus as appropriate for residential use, and stated in its literature that its ozone output was well within acceptable limits. Despite this factual disagreement about Consumers Union's motivations, it is clear that Maher did sell the Panda Plus ozonator to Fox, and that was the unit which was reviewed in *Consumer Reports.*

Consumers Union conducted tests on the Panda Plus using the methodology set out in UL Standard 867.[7] The UL test methods were modified in that Consumers Union used a sealed test chamber measuring 9½ by 20½ by 8 feet (approximately 1550 cubic feet), while the UL standard calls for a sealed room measuring 8 by 12 by 10 feet (960 cubic feet). Iacopelli helped design this test chamber. Consumers Union alleges, and Quantum does not refute, that by using the larger chamber Consumers Union actually recorded lower ozone concentrations.

Gary Vickers ("Vickers"), a Consumers Union technician, performed the testing under Iacopelli's direct supervision. According to Consumers Union, the initial testing in the sealed chamber was conducted on February 12 and 13, 1992. Ozone measurements were taken two inches from the ozonator's output port as set out in UL Standard 867. Two different devices were used to measure ozone concentrations in the test chamber. Ozone detector tubes were used to corroborate the ozone levels recorded by an electronic ozone monitor that was specially modified by Consumers Union for its testing purposes. Quantum alleges that these testing devices were inaccurate and that their use was scientifically inappropriate.[8]

With the Panda Plus set on its highest setting, the ozone concentration was measured at 1000 ppb within thirty minutes.[9] After fifteen hours, the level reached 2700 ppb. The Panda Plus was tested on its lowest setting from February 29 through March 2, 1992. According to Consumers Union, the ozone concentration reached 150 ppb after 42.5 hours. All results obtained from the sealed room testing exceeded the 50 ppb limit established by the FDA. Iacopelli recorded these test results in the Project Data Book, an exhaustive record of Consumers Union's testing which was submitted in support of this motion. Quantum asserts that its products comply with both the FDA and OSHA limits, and alleges that its ozonators can not generate the levels of ozone concentration reported by Consumers Union.[10]

Having concluded the sealed room testing, Consumers Union held a standard pre-report meeting on or about March 17, 1992. The meeting included Iacopelli, Connelly, and Ned Groth, Ph.D. ("Dr. Groth"), a Manager in Consumers Union's Technical Director's Office. At the meeting, Iacopelli described the results of the ozone testing and stated that he believed both the Alpine and Quantum machines were "not acceptable" because their ozone emissions exceeded FDA standards. All present concurred with Iacopelli's assessment, and it was also agreed, at Dr. Groth's suggestion, that further testing should be conducted with the same chamber re-configured to provide one complete air change per hour—a rate of air exchange

---

7. Consumers Union points out that although Quantum itself claimed in its marketing material that its ozonators comply with all requirements of UL 867, UL declined to approve Quantum's ozonators.

8. As with many of Quantum's allegations, this assertion is supported by little more than conclusory statements contained in self-serving affidavits.

9. Consumers Union alleges, and Quantum's then-President Lathan admitted, that it is "a very human propensity" for users to set the ozonator at its highest setting.

10. Quantum submits virtually no evidence to support these conclusory assertions made in the affidavits of DiPippo and William H. Racca. DiPippo provides scantily documented test results for the smaller Panda ozonator, but none for the Panda Plus model that was tested by Consumers Union. Interestingly, even the test results DiPippo claims to have recorded for the smaller Panda model are well in excess of the FDA limit.

typical for a home. Quantum alleges that the decision to conduct additional testing reflects Consumers Union's realization that its sealed chamber testing was flawed. However, Quantum has produced no evidence to support this conclusory speculation about the state of mind of Consumers Union officials.

On April 28 and 29, 1992, the Panda Plus was subjected to the additional testing. Ozone measurements were taken by Vickers, under Iacopelli's supervision, at a distance of nine feet from the Panda Plus—a distance calculated to measure the ambient ozone level within the room. After 24 hours operation, ozone detector tubes measured the ozone concentration at 700 ppb. These results were again recorded in the Project Data Book.

Once all testing was concluded, Iacopelli prepared a Technical Report detailing his findings. Included in the Technical Report is an extensive list of the sources Iacopelli consulted during his exhaustive research. The report was reviewed by Connelly, Vickers, Dr. Groth, Jeffrey Asher, and Alan Eckhaus from the Technical Director's Office, in order to assure its technical accuracy and readability. Vickers also conducted a detailed citation check to verify the accuracy of the data to be cited in the article. Finally, Consumers Union policy requires that whenever a project leader concludes that a product should be judged "not acceptable," that decision must be approved by the Technical Director, R. David Pittle, Ph.D. ("Dr. Pittle"). Dr. Pittle approved Iacopelli's determination that both the Alpine and Quantum ozone generators were "not acceptable" after he met with Iacopelli and Connelly in early May 1992.

Once Consumers Union's Technical Division approved the findings of the air cleaner testing, the Editorial Department proceeded to draft the article which appeared in the October 1992 issue of *Consumer Reports.* Fox, the article's author, first reviewed numerous background sources including magazine and newspaper clippings, scientific and medical reports, statements by public and private agencies, and the Minnesota state court decisions in the litigation involving Alpine. Fox submitted a first draft of the article to Consumers Union's Managing Editor, David Heim, in July 1992. Drafts of the article were also circulated within Consumers Union, and were reviewed by both the Technical Division and the Editorial Department. In the Technical Division, Iacopelli, Connelly, Dr. Groth, Vickers, and Dr. Pittle all reviewed drafts and suggested changes where necessary prior to final publication. In the Editorial Department, drafts were reviewed by Heim, Fox, and Irwin Landau, who was then Editor of Consumers Union. The Consumers Union library also performed a source checking review to verify the accuracy of statements contained in the article. Consumers Union alleges that when the article was finally published in October 1992, no one who was involved with either the testing or the resulting article had any doubt that all references to ozone, Quantum, and the Panda Plus were completely truthful and accurate.

Consumers Union asserts, and Quantum admits, that the safety and efficacy of ozone generating air purifiers has been a controversial topic for more than fifteen years. In 1976, the FDA adopted its regulation limiting ozone levels in indoor occupied spaces to 50 ppb. The American Lung Association published a study illustrating the dangers of ozone as an air pollutant in July 1989, and in July of 1990, the American Lung Associations of Michigan called for a ban on the sale of ozonators. Similarly, both the American Lung Associations of Minnesota and the North Carolina Department of Environment, Health, and Natural Resources have recommended against the use of ozone generators in occupied spaces. In 1991, a Minnesota state court found Alpine, Quantum's competitor, guilty of violating consumer fraud laws by making false claims that ozone is safe indoors, has health benefits, poses no risks to people with respiratory disorders, and that Alpine ozonators emit harmless concentrations of ozone. In May 1990, a television news program in Minneapolis aired a story criticizing Alpine.

Quantum did not remain silent in the midst of this debate about ozone and ozonators. In response to consumer inquiries, Quantum distributed a letter written by Ed McCabe ("McCabe"), the author of the book *Oxygen*

*Therapies,* in which McCabe discussed the benefits of ozone generators and dismissed their critics by stating the "only negative comments are traceable to industries with competing products, or from the people aligned with them who believe the negative propaganda." McCabe and Quantum had a reciprocal relationship: McCabe received commissions on Quantum sales which he generated, and Quantum sold McCabe's book. Additionally, Lathan, Quantum's former president, wrote a letter to the editor which was published by the magazine *Indoor Air Review* in which Lathan criticized the FDA for concluding that ozone is a toxic substance with no known medical benefits. Lathan also authored an article published in the periodical *The Family News* entitled, "OZONE IS OUT TO GET YOU, It's Tired of Being Maligned" in which he defended both ozone and the use of ozone generating air purifiers.

The controversy over ozone is also a factor in the marketing of Quantum's products. The company's promotional literature includes reprints of articles reviewing its products, as well as an article which extols the supposed health benefits attributable to ozone. Quantum's ozonators have been reviewed and promoted in several periodicals.[11] Quantum asserts that this publicity constituted "free advertising" and that it has never paid for any print or broadcast advertising.

Quantum voluntarily submitted its ozonators for review by several organizations, both public and private. In a letter to Quantum dated February 8, 1991, the Rhode Island Department of Health declined to approve Quantum's products for use in regulated food businesses. James Gamelin, Acting Principal Industrial Hygienist at the Department of Health noted in an internal memorandum that he was "even more concerned that use of these ozone generators presents significant potentials for unnecessary and undesirable health risks to the general public, especially those with compromised respiratory conditions." The Department based its decision not to approve Quantum's ozonators on its finding that "ozone is considered *unsafe*

to breath [sic] at any level." Quantum also submitted its ozonators for UL approval. UL denied its approval due to concern over the ozone levels produced by the machines. Finally, and most significantly, Quantum solicited Consumers Union to review its products. Consumers Union did so and the resulting article led to this lawsuit.

## II. *DISCUSSION*

### A. Summary Judgment Standard

■ Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for a court ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the non-moving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that there is insufficient evidence in the record to support the non-moving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If that showing is made, the motion can then be granted if, as a matter of law, the moving party is entitled to judgment in its favor. In weighing a motion for summary judgment, the Court must consider the evidence on the record in the context of the substantive evidentiary burden which must be met in order for a party to prevail at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In a defamation case where the First Amendment standard articulated by the Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S.

---

11. These periodicals include: *Practical Sailor; Soundings; Marine Business Journal; Latitude 38; OEM Business; West Marine 1992 Master Catalog; Success; Pet Product News;* and *The*

*Studio Report.* Quantum also received coverage of its business activities in several articles that appeared in the local Rhode Island press.

254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is applicable:

[A] court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

*Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15. As the following analysis will demonstrate, Quantum is clearly a limited purpose public figure. Accordingly, if Consumers Union can show that Quantum would be unable to prove to a reasonable jury, by clear and convincing proof, that Consumers Union published defamatory or disparaging falsehoods with actual malice, then this Court must grant summary judgment for defendant.

### B. Applicable Law

The Court need not undertake an extensive analysis of what state's law is applicable to this case. The First Amendment standards articulated in *New York Times* and its progeny, and discussed below, are controlling.

### C. Quantum is a Limited Purpose Public Figure

■ In *New York Times,* the United States Supreme Court held that the First Amendment precludes public officials from recovering damages for defamatory statements relating to their official conduct unless they can prove that the defendant made the statements with actual malice. 376 U.S. at 279–80, 84 S.Ct. at 725–26. The Court in *New York Times* defined actual malice as knowledge that the statement was false or reckless disregard as to whether or not it was false. *Id.* at 280, 84 S.Ct. at 726. The constitutional protection recognized by the Court in *New York Times* was extended to cover public figures in addition to public officials in *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009–10, 41

L.Ed.2d 789 (1974), the Supreme Court outlined three categories of public figures to whom the *New York Times* standard applies.

[I]t may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009.

Those defamation plaintiffs who have voluntarily injected themselves into particular public controversies are classified as limited purpose public figures. *Id.* at 351, 94 S.Ct. at 3013. As such, the *New York Times* First Amendment standard applies to allegedly defamatory statements concerning the limited range of public issues with which the limited purpose public figure plaintiff is involved. *See id.*

■ Like most judicially defined constitutional standards, the heightened First Amendment threshold that public figure defamation plaintiffs must overcome reflects a balance between competing interests. On one hand, states have an interest in securing compensation for individuals whose reputation has been harmed by defamatory falsehood. *Gertz,* 418 U.S. at 341, 94 S.Ct. at 3007–08. On the other hand, First Amendment jurisprudence recognizes that the freedoms of speech and the press require "breathing space" so that they may be meaningfully exercised. *Id.* at 342, 94 S.Ct. at 3008 (citing *National Ass'n for Advancement of Colored People v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963)). The Supreme Court has recognized that imposing liability for defamation risks encouraging a cautious and restrictive exercise of First Amendment freedoms which will restrict the free flow of information to the

public. *Gertz,* 418 U.S. at 340, 94 S.Ct. at 3007. It is such "self censorship" that *New York Times* and its progeny seek to prevent.

█ Public figure defamation plaintiffs must surmount a higher constitutional threshold because the state's interest in protecting public figures from defamatory falsehood is less acute than its interest in protecting private individuals. *See Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. The policy rationale behind this distinction has two main components. First, public figures are less vulnerable to injury from defamatory falsehoods than private individuals. *Id.* Because public figures usually have greater access to the channels of communication, they are better able to mount an effective public response to rebut false statements. *Id.* Second, public figures have, in essence, assumed the risk of injury from defamatory falsehood by voluntarily entering the public forum. *Id.* at 345, 94 S.Ct. at 3009–10. Given these two factors, in a defamation case brought by a public figure, the balance tips towards protecting the First Amendment interest of encouraging freedom of speech and the press.

█ The Supreme Court's decision in *Gertz* reflects this policy rationale. The Court held in *Gertz* that, "So long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010. If a plaintiff is a public figure,

however, then the burden is on the plaintiff to prove by clear and convincing evidence that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. *Id.* at 342, 94 S.Ct. at 3008.

█ It is therefore necessary for this Court to determine at the outset whether Quantum is a public figure. If the Court determines that Quantum is a public figure, then Quantum will be required to surmount the lofty barrier of the *New York Times* standard to succeed in opposing Consumers Union's motion for summary judgment on its defamation and product disparagement claims.[12]

█ Whether Quantum is a public figure is a question of law for the Court to decide. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 938 (3rd Cir.1990), *cert. denied, Independence Blue Cross v. U.S. Healthcare Inc.,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Nicholson v. Promotors on Listings,* 159 F.R.D. 343, 344 (D.Mass.1994). Consumers Union argues that Quantum is a "prototypical" limited purpose public figure.[13] The determination of a plaintiff's status as a limited purpose public figure requires a particularized, fact-sensitive examination of the nature and extent of the plaintiff's participation in the controversy that gave rise to the alleged defamation. *See Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013; *Bruno & Stillman, Inc. v.*

**12.** The *New York Times* actual malice standard applies to both product disparagement claims and defamation claims in cases where the plaintiff is a public figure. *Flotech, Inc. v. E.I. DuPont de Nemours & Co.,* 814 F.2d 775, 777 n. 1 (1st Cir.1987); *Bose Corp. v. Consumers Union of U.S., Inc.,* 508 F.Supp. 1249, 1271 (D.Mass. 1981), *rev'd on other grounds,* 692 F.2d 189 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose,* the district court noted that a manufacturer's interest in the reputation of its products deserves less protection than an individual's personal reputation because damage to the reputation of a product can always be quantified monetarily, and because manufacturers have access to the channels of communication to rebut disparaging comments. 508 F.Supp. at 1270. Conversely, a strong policy rationale favors recognizing First Amendment limitations on product disparagement claims because consumers have an interest in obtaining

information about the quality and characteristics of products. *Id.* Especially because such information often pertains to health and safety issues, the First Amendment prevents the free flow of product information from being stifled by the threat of disparagement claims. *See id.* at 1271. Accordingly, if this court finds that Quantum was indeed a public figure, then all four counts of Quantum's Complaint will be subject to the actual malice test.

**13.** Consumers Union does not argue that Quantum enjoys sufficient fame or notoriety to qualify as a public figure for all purposes. From the facts on the record it is obvious that Quantum does not. It is also clear that Quantum is not an involuntary public figure, and Consumers Union does not argue to the contrary. Therefore, the Court confines itself to examining whether Quantum is a limited purpose public figure.

*Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir.1980). Although the pertinent Supreme Court precedents all dealt with the public figure status of individual plaintiffs, the Court of Appeals in *Bruno & Stillman* set out the standards to be applied in the First Circuit when determining the status of corporate plaintiffs. *See* 633 F.2d at 590–91.

■ The First Circuit has established what is, in essence, a three-part test to determine whether a corporate plaintiff is a limited purpose public figure. *See id.* at 590–91. First, the Court must determine whether the controversy which gave rise to the defamation was a public, or merely private, controversy. *See id.* Second, the Court must determine whether the controversy pre-existed the defamatory statements at issue. *Id.* at 591. Third, the Court must examine the nature and extent of the plaintiff's participation in the controversy. *Id.* As the Supreme Court explained in *Gertz*, the Court must establish whether the plaintiff "thrust [itself] into the vortex of [the] public issue" or "engage[d] the public's attention in an attempt to influence its outcome." 418 U.S. at 352, 94 S.Ct. at 3013.

■ The controversy forming the basis for a plaintiff's status as a limited purpose public figure can not merely be a private dispute. *See, e.g., Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976) (celebrity divorce was purely private dispute, not public controversy). Rather, the implications of the controversy must extend beyond the self-interest of the litigants in such a way that its resolution will have some impact on the public. *See Bruno & Stillman*, 633 F.2d at 591. Accordingly, the public importance of the issues is an important factor for the Court to consider when analyzing whether there was a public controversy.[14] *See Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 653 F.Supp.

451, 460 (D.Mass.1986). *See also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59, 105 S.Ct. 2939, 2944–45, 86 L.Ed.2d 593 (1985).

Courts have recognized that, by its nature, consumer reporting involves matters of particular interest to the public. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 280 (3rd Cir.1980); *Bose*, 508 F.Supp. at 1270–71. It enables citizens to make better informed purchasing decisions by providing information about consumer products. *Steaks*, 623 F.2d at 280. This information is especially important to the public when it relates to health and safety concerns about particular products. *See Bose*, 508 F.Supp. at 1271. Accordingly, courts have recognized that the First Amendment protects the free flow of such consumer information. *Steaks* at 280; *Bose* at 1271. Therefore, "[r]egardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster ... First Amendment goals...." *Steaks*, 623 F.2d at 280.

The controversy must not only be of public concern, it must also have existed prior to the defendant's publication of the allegedly defamatory statements. *Bruno & Stillman*, 633 F.2d at 591. This requirement ensures that a defendant cannot create its own public controversy in order to claim First Amendment protection for its defamatory statements. *Id.* (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979)). Rather, the defendant must have "added its voice to the chorus that was already discussing" the controversy. *Bose*, 508 F.Supp. at 1273.

■ Finally, the Court must examine the nature and extent of the plaintiff's participation in the controversy to determine "whether the prominence, power, or involve-

---

**14.** Although the Supreme Court in *Gertz* held that the focus of a court's inquiry should be on the status of the plaintiff, and expressly rejected the approach taken in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), where the central inquiry was whether the statements pertained to matters of general or public concern, the determination of the plaintiff's status necessarily requires a court to examine the public or private nature of the controversy underlying the alleged defamation. As one commentator noted, "Now judges are asked to determine whether a controversy is 'public', a determination indistinguishable to the naked eye from whether the subject matter is of public or general concern." Laurence H. Tribe, *American Constitutional Law* § 12–13, at 881 (2d ed. 1988) (footnote omitted).

ment of the [plaintiff] company in respect to the controversy—or its public efforts to influence the results of such controversy—were such as to merit public figure treatment." *Bruno & Stillman*, 633 F.2d at 592. Courts have considered a number of factors when analyzing the extent of corporate defamation plaintiffs' participation in public controversies relating to their products. One factor is the nature and extent of the advertising and publicity campaigns undertaken by a plaintiff. *See Steaks*, 623 F.2d at 273; *Bose*, 508 F.Supp. at 1273. Another is a plaintiff's pursuit of a marketing strategy that emphasizes the controversy. *See Bose*, 508 F.Supp. at 1273. A factor that is particularly pertinent in this case is the plaintiff's active solicitation of independent product testing and reviews, and the use of such reviews in the plaintiff's marketing efforts. *See id.* All of these factors illustrate ways in which plaintiffs seek to influence the outcome of pre-existing controversies, and consequently invite attention, comment and criticism. *Id.*

Although not formally incorporated into the *Bruno & Stillman* test, an additional factor identified by the Supreme Court in *Gertz* is helpful when considering the public figure status of a defamation plaintiff. Because the public figure doctrine is based in part on the greater media access enjoyed by public figures, it is helpful to examine the media access enjoyed by a particular plaintiff. *See Bose*, 508 F.Supp. at 1274.

■■ Consumers Union contends that Quantum is a limited purpose public figure because Quantum actively participated in a public controversy about the safety and efficacy of ozone generating air purifiers. This controversy is clearly public in nature. It stands in marked contrast to the celebrity divorce proceeding which the Supreme Court held to be a purely private controversy in *Time, Inc.*, 424 U.S. at 454–55, 96 S.Ct. at 965–66. Rather, the controversy swirling in the background of this case revolves around a significant public health issue, and the effects of its resolution would clearly range far beyond the scope of the self-interest of Consumers Union and Quantum.

It is undisputed that numerous governmental and private entities have expressed concern, wholly separate from this dispute between Quantum and Consumers Union, about the health effects of ozone and ozonators. Additionally, this case arose from consumer reporting about the health and safety risks associated with the use of Quantum's Panda Plus ozonator. As both the Third Circuit in *Steaks* and the district court in *Bose* observed, consumer journalism such as that contained in Consumers Union's article, especially where it relates to health and safety issues, involves a matter of particular concern to the public. *See Steaks*, 623 F.2d at 280; *Bose*, 508 F.Supp. at 1270–71. Accordingly, this Court finds that the article published in the October 1992 issue of *Consumer Reports* clearly involved a public controversy.

It is equally obvious that the public controversy about ozone and ozonators pre-existed the allegedly defamatory statements published by Consumers Union. Quantum admits that the public controversy has continued for at least 15 years. The *Consumer Reports* article was published in October 1992. The FDA adopted its regulation limiting ozone levels in occupied indoor spaces in 1976. In the interim span of some 16 years, standards relating to ozone generators were promulgated by OSHA and UL, and bulletins warning of the health risks related to ozone and ozonators were disseminated by the American Lung Associations of Minnesota and Michigan as well as the North Carolina Department of Environment, Health, and Natural Resources. The Court need elaborate no further on the existence of this controversy prior to October 1992. As the district court noted in *Bose*, Consumers Union "simply added its voice to the chorus that was already discussing the merits" of ozone and ozonators. *See Bose*, 508 F.Supp. at 1273.

Quantum was an active participant in this public controversy and attempted to influence its outcome. Quantum took advantage of the "free advertising" opportunities made available by a number of publications to promote the efficacy of its ozonators. By Quantum's own admission, reprints of many of the product reviews that appeared in these publications were later used by Quantum in the promotional materials it supplied to prospective customers. One article about Quantum's

ozonators that appeared in the December 1990 issue of *Practical Sailor* acknowledged that "ozone is controversial stuff" and included statements attributed to Lathan, Quantum's former president, which extolled the ozonators' benefits while down-playing their harmful side effects. Included in the promotional literature that Quantum sent to prospective customers was the letter written by McCabe which extolled the virtues of ozonators and criticized those who had raised concerns about their use. Also included was a reprint of an article praising ozone's beneficial health effects.

Quantum also submitted its products for approval to both the Rhode Island Department of Health and UL, both of whom declined to approve Quantum's ozonators. Finally, and most importantly, Quantum affirmatively solicited Consumers Union's review of its products in Lathan's letter to Stube. All of these facts point to the conclusion that Quantum was an active participant in the public controversy surrounding ozone and ozonators. As such, Quantum clearly invited comment and criticism of the sort which the *New York Times* doctrine recognizes as worthy of First Amendment protection.

One final factor which influences the Court's analysis is Quantum's access to the media to rebut the statements contained in the article. Quantum has repeatedly taken advantage of the opportunities for publicity offered by various magazine publishers. It has also commanded attention in the local Rhode Island press, and on more than one occasion has issued press releases that resulted in media coverage. Given all of these factors: the preexisting public controversy about ozone and ozonators, Quantum's clear efforts to influence the outcome of the controversy, and Quantum's access to the media, it is obvious that Quantum is a limited purpose public figure as contemplated by *Gertz, Bruno & Stillman,* and *Bose.*

Having determined that Quantum is a limited purpose public figure, the Court must now analyze whether Quantum's claims survive Consumers Union's motion for summary judgment under the *New York Times* standard. On the record now before the Court, the Court must determine whether a reasonable jury could find that Consumers Union published the article in question with actual malice, that is knowledge that it was false or reckless disregard as to its truth or falsity. *See Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15. To prevail on its claims, Quantum is required to prove actual malice by clear and convincing evidence, and this evidentiary burden must guide the Court's analysis at the summary judgment stage. *See id.*

## D. Falsity

■ When applying the *New York Times* test, the Court must first determine whether the statements contained in the article published by Consumers Union in the October 1992 issue of *Consumer Reports* were false. A public figure plaintiff must prove the falsity of the allegedly defamatory statements in order to prevail in a suit for defamation. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986).[15] To be actionable, the statement must be materially false, that is, the impact of the statement on the reader's mind must be different from the effect that a true statement would produce. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991). Accordingly, a minor inaccuracy does not amount to an actionable falsehood unless it materially alters the substance of the statement. *See id.*

■ In this case, Quantum makes essentially three arguments in support of its position that the statements contained in the article were false. First, Quantum contends that Consumers Union improperly tested the Panda Plus instead of the smaller Panda ozonator. Second, Quantum alleges that Consumers Union used an improper test

---

**15.** It is unsettled under the Supreme Court's decisions whether a limited purpose public figure plaintiff must prove falsity by clear and convincing proof, or whether that heightened evidentiary standard applies only to the issue of actual malice. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 2682–83 n. 2, 105 L.Ed.2d 562 (1989). This Court need not dwell on the question because under either standard Quantum clearly fails to establish the falsity of Consumers Union's published statements.

methodology and inaccurate ozone measuring devices, resulting in inflated ozone measurements that exceed the possible output of the Panda Plus. Finally, Quantum argues that Consumers Union did not test the Panda Plus for odor removal, but stated that it was ineffective nonetheless. Conspicuous by its absence is any assertion that Consumers Union: 1) did not perform the tests discussed in the article; 2) did not achieve the ozone testing results reported in the article; or 3) did not base its conclusion that the Panda Plus was "not acceptable" on its finding that the ozone levels produced by the Panda Plus were well in excess of the limits set by the FDA.

Quantum argues that Consumers Union's conclusion that the Panda Plus was not acceptable constitutes an opinion based on undisclosed defamatory facts. This argument clearly fails. Although the *Consumer Reports* article did not detail the test methodology utilized by Consumers Union, it did indicate that the unit was tested in both a sealed chamber and a room configured to provide one air change per hour. The article cited the FDA benchmark and clearly stated the results of Consumers Union's testing. Quantum has provided the Court with virtually no evidence to demonstrate that the information contained in the article was false. The scant evidence adduced by Quantum in an effort to create the inference that Consumers Union performed scientifically inappropriate testing is contained in conclusory and self-serving affidavits that stand in marked contrast to the exhaustive record produced by Consumers Union.

To support its motion, Consumers Union submits the affidavit of Morton Lippman, Ph.D., an environmental scientist who tested the same Panda Plus ozonator that was reviewed in the article. Dr. Lippman achieved results substantially the same as those reported by Consumers Union, and he concludes that Consumers Union's testing was accurate and appropriate. Quantum has quite simply failed to produce sufficient evidence to refute the facts contained in the record produced by Consumers Union, and has therefore failed to create a genuine issue of fact as to the falsity of the article. Plainly put, the statements contained in the article were true.

## E. Actual Malice

Not only would Quantum be unable to convince a reasonable jury that the statements contained in the article were false, but the evidence adduced by Quantum in opposition to Consumers Union's motion for summary judgment falls far short of the requisite clear and convincing proof that Consumers Union published those statements with actual malice. As the Supreme Court has explained, "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice'." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). Actual malice is defined as a publisher's knowledge that a statement was false or reckless disregard as to its truth or falsity. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. This standard places a limitation on the protection available to publishers because the First Amendment does not protect those who knowingly or recklessly make false statements. *See Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

There are two methods of proving that a defamatory falsehood was published with actual malice. First, a public figure plaintiff can prove actual malice by showing that the defendant knew the defamatory statement to be false but proceeded to publish it anyway. *See New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. Second, actual malice can be established by proving reckless conduct on the part of the publisher. *See id.* The Supreme Court explained in *Garrison* that in order to demonstrate recklessness, a plaintiff must show that a publisher had a "high degree of awareness of . . . [the] probable falsity" of the published statements. 379 U.S. at 74, 85 S.Ct. at 215–16. In *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court further elaborated on the concept of

recklessness as it pertains to the *New York Times* actual malice standard. The Court noted that:

> [R]eckless conduct is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [its] publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325. If the allegedly defamatory statement was made in good faith, then the public figure plaintiff will be unable to recover. *See id.* In defining these First Amendment standards, the Supreme Court expressly understood that it was erecting a barrier that would be difficult for defamation plaintiffs to hurdle. *Id.* The Court reasoned, however, that in order to ensure the continued publication of the truth, the First Amendment must protect those who publish some erroneous statements as well. *Id.* at 732, 88 S.Ct. at 1326.

■ Based on the evidence submitted by both Quantum and Consumers Union, Quantum has failed to allege sufficient facts to create a jury question on the issue of actual malice. Quantum argues that actual malice can be inferred from Consumers Union's decision to purchase the larger Panda Plus ozonator instead of the smaller Panda model. Quantum also contends that Consumers Union juxtaposed the article's discussion of Quantum with its explanation of the litigation involving Alpine, and as such created a knowingly false inference that Quantum employed improper sales techniques. Finally, Quantum insists that Consumers Union published the sealed room test results when it knew they were based on an inaccurate and inappropriate test methodology. All three of these assertions as to Consumers Union's state of mind are raised in Quantum's memorandum, but are not supported by any evidence beyond that contained in Quantum's conclusory and self-serving affidavits.

Quantum has provided no factual record from which a reasonable jury could find clear and convincing proof that Consumers Union had knowledge of falsity or had serious doubts about the truth of the statements contained in the article. In contrast, the extensive factual record produced by Consumers Union illustrates a high level of scientific and journalistic professionalism on the part of all Consumers Union employees involved in the home air cleaner project. Consumers Union conducted extensive research about the benefits and risks of ozonators. It carefully selected, adapted, and implemented what it believed was the most appropriate test methodology. It insisted on purchasing the Panda Plus in order to provide a fair comparison between the Quantum and Alpine ozonators.[16] The tests performed on the Panda Plus were carefully conducted by well-trained personnel and the results were carefully recorded in the Project Data Book. Additional testing, though clearly not necessary to reach the conclusion that the Panda Plus was "not acceptable," was performed under more realistic conditions with hourly air changes, and the results (which were more favorable to Quantum, but still well in excess of 50 ppb) were included in the article. The decision to judge the Panda Plus as "not acceptable" was made by Iacopelli and reviewed twice—once at the pre-report meeting with Connelly and Dr. Groth, and once by Dr. Pittle, Consumers Union's Technical Director. The article itself was painstakingly reviewed and edited and was subjected to extensive fact-checking to assure its accuracy. From the facts on the record it is clear that Consumers Union exercised scrupulous care to ensure the publication of a fair, accurate, and well-researched article. Against this record, Quantum's conclusory arguments are entirely inadequate to prove, by clear and convincing evidence, that Consumers Union acted with actual malice. Therefore, the First Amendment renders Quantum incapable of prevailing on its claims.

## F.  Qualified Privilege

Because Consumers Union is entitled to judgment under the First Amendment stan-

---

**16.**  Quantum's assertion that this is indicative of actual malice on the part of Consumers Union is clearly speculative, and no evidence is produced to rebut Consumers Union's explanation.

dard set out in *New York Times,* the Court need not consider Consumers Union's argument that it is protected from liability by a qualified privilege under Rhode Island law.

### III.  *CONCLUSION*

The Court finds, as a matter of law, that Quantum is a limited purpose public figure. Therefore, it can not prevail on either its defamation or product disparagement claims without proving, by clear and convincing evidence, that the article published by Consumers Union in October 1992 contained defamatory falsehoods and was published with actual malice.  It is abundantly clear to this Court that the statements contained in the article were neither false nor published with actual malice.  The Court therefore grants Consumers Union's motion for summary judgment on all four counts set forth in Quantum's complaint.  The Clerk shall enter judgment forthwith for defendant on all counts of the complaint.

It is so ordered.